Ms. Maidwell, when you are ready, no, no problem, when you're ready. Mr. Del Carpio was convicted of 24 counts of wire fraud and 10 counts of engaging in criminal transactions and criminally derived funds. The district court sentenced him to 235 months, concurrent terms of 235 months on the wire fraud counts and 120 months on the monetary transaction counts and also ordered over $5 million in restitution. I raised six issues on appeal. I would like to begin with the sentencing guideline issue, which is the fifth issue raised. He was sentenced under an incorrectly high guideline range, and that was a result of an incorrectly high offense level. He was sentenced under, the offense level was calculated at 38, and there were two levels off for assistance. It resulted in 188 to 235. Correctly calculated, it would have been an offense level of 37 and a resulting guideline of 168 to 210. Was that ever reflected in the pre-sentence report computation? No, it was not. No, it was not. So what happened in the pre-sentence, well, the incorrect calculation is in the pre-sentence report, but the correct calculation is not. I'm on plenary review. So this was not raised in the district court. There were a lot of objections to Sentence was consistent with what the pre-sentence report was. Right. He was sentenced to 235, and that was the top of the range as found. It was incorrectly calculated Did you represent Mr. DelCarpio in the district court? No, I did not, Your Honor. But did the FPD? Yes, they did, Your Honor. Did the FPD look at the pre-sentence report prior to the sentencing hearing? Yes, they did, Your Honor. And discuss it with Mr. DelCarpio? Yes. But they just missed this? Yes. What would be an example of a guidelines error that's not plain error after Rosales-Morales? Can you think of an example? That is not plain. Yes. If this Court were to find that an error was not clearly erroneous, which is an extremely difficult standard to make. You mean plain? So if a number of the guidelines at issue are reviewed for clear error, and that's a very deferential standard. So I could see a court saying, you know, we argue it's error, and the court says, well, it's a deferential standard review, so it's not. You mean plain? Yes. The error's not plain? The second prong of the plain error? Right, right. So it would be under plain error. So what circumstance would we be able to look at a guidelines calculation? I understand what you're saying is that these enhancements were applied to the wire fraud as opposed to the money laundering, and that's plain. So what would be an example of a guidelines mistake that wouldn't be plain? Well, that is more difficult, Your Honor, given the Supreme Court's cases of Molina-Martinez, where they said if the defendant is sentenced under a higher guidelines reign, that's sufficient to show effect on substantial rights. And then in Rosales-Morales, where they addressed the fourth prong and said a guidelines error is the type of error that should ordinarily be remanded for resentencing. Is the position of the federal public defender that any guidelines miscalculation is going to meet the plain error standard? I'm not willing to go that far, and I'm not willing to make that statement on behalf of the federal public defender. I can't come up with an example off the top of my head where it wouldn't apply. I would be most interested, in a supplemental letter brief, if you could think of an example, because I can't think of one. I guess my next question would be, what is the purpose of looking at the pre-sentence report prior to the sentencing hearing, if you can use plain error to challenge any sentencing guideline miscalculation on appeal? I do understand, Your Honor, where you're coming from. We were, in fact, the lawyers on Rosales-Morales, and we discussed this issue prior to going before the United States Supreme Court. The reason is that we tell our trial attorneys over and over again, your best chance of winning something for your client, a lower sentence, is in the district court. You need to object. You need to make those objections clear. I don't mean to interrupt, but that's just not true based on what we were just talking about, right? I mean, if every error is going to be plain error, then why would you need to object to preserve this? That's the right thing to do. That I understand. Because that's what we do as public defenders. We scour the record. We try and find all the errors. We argue them to the district court. We also argue for variances below guideline sentences. And you can't make a proper variance objection if you don't have what you believe is the proper guideline. And that's why I certainly understand that. I wasn't suggesting that it was the wrong thing to do or right. There was no moral valence to the question. I was simply trying to ask, as a legal standard, if the standard we apply on plain error is the same we would have applied if you had objected, I'm trying to understand where the space is in your view between the standards of review that apply here as opposed to if you'd objected and said, no, no, no, you're applying the chapter 3 enhancements to the wrong underlying conduct in the district court. And my understanding is that they would be exactly the same. We would just try to figure out whether the guidelines are calculated incorrectly. And I think that goes back once again to the Supreme Court's decisions. That has kind of left us in an odd position. But you won that case. You just said you won that case, right? We did. Congratulations. Thank you, Your Honor. And we have actually discussed the issue that you bring up, Your Honor. And the result we determined as an office was that we object in the district court all the time. And it was my view as head of appeals that our best chance is always in the district court. Suppose it wasn't an FPD attorney in the district court and it was some other attorney. Why would it be an unreasonable strategy to hold something back, hold a couple things in the tank, maybe recognize that there's a clean air, that there's a problem with the guidelines calculation, but not make the objection, argue for other things, focus the judge's attention on other, whether it's a variance or some other fact in the allocution, knowing that you're going to have a great appeal issue and the worst that you're going to end up with is being right back in the district judge and have a reconsideration after getting a remand from the Fifth Circuit. What would be wrong with that strategy? Well, Your Honor, I suggest that not many lawyers function on that strategy. First of all, for example, in our office, trial counsel are separate from appellate counsel and rarely do trial counsel think about appeals. It's a frustration among appellate counsel that that is in fact true. I have worked training the CJA lawyers from the Western District of Texas and I can personally tell you that I don't see that type of strategizing going on. So that was one of the concerns that actually I believe the government raised on Rosales Morales was the idea of hiding behind, you know, strategizing to, you know, win on appeal instead of in the district court. I just don't believe it's realistic with criminal defense work. For one thing, you have a, in the district court, you have a personal relationship with this individual. So you really are trying to represent them in the best fashion that you can. And so appellate issues really are on the side. And as I said, we've instructed our attorneys and I've never at any of our trainings heard any of the CJA lawyers say, wouldn't this be a great idea? I mean, an FPD lawyer did say it and we said no. What if the district judge had said exactly what he says in this transcript, gets all the way down to the end, and then he says, and if for whatever reason I've miscalculated the guidelines, assuming I'm under the statutory maximum so I don't have any statutory maximum problems, and this comes back to me for any other reason conceivable in the world, I'm going to look at the 3553A factors and the other factors I'm supposed to look at under the guidelines consideration and I'm going to impose 235 months concurrently, exactly the same way I did. Well, Your Honor, I think you answered the question you had originally asked of me, which is plain air that wouldn't get reversed. Because that was what I was wondering. Yes. Do you think that's not plain air? Well, I think there's, I think it could meet the plain air standard, but you wouldn't be able to show effect substantial rights depending on what the court said, what the district court said when it imposed the sentence. In this court, there are several cases out of this court that say where the court says in no uncertain terms, even if the guideline range I calculated is incorrect, that I would have imposed the 235-month sentence for these 3553A reasons. And so I think that would be where it wouldn't come back on plain air review. Would you like me to address the sentencing guideline issue any further than that, or would you like me to move on to something else? I'm hearing no questions in that regard.  Well, then, that moved much quicker than I anticipated. So I'll talk about the restitution issue just briefly. I filed a 28-J letter. I apologize. I filed it yesterday, but it was on, and I hope the court has it. It was on an opinion that came out of this court on Friday, and it had to do with the government's argument that the objections made in the district court did not, were not the same as the argument raised on appeals. So I filed a 28-J letter on that, and in there I set out a lot of the bases for our view that the restitution issue is not under plain air, that it is, in fact, preserved for review. And the government essentially argues that we're pointing out things in the record that should have been pointed out to the judge, and therefore it's plain air review. The defense counsel repeatedly objected, well, first of all, the probation officer, when they calculated the pre-sentence report and did the restitution, they said investments only, that in a Ponzi scheme you don't get credit for returns. So defense counsel filed an objection to that. Then the probation officer issued a revised pre-sentence report, and in that said investments only, and the defense had provided the government with a thumb drive that held information they said represented returns. And the probation officer said, the government says that's not verifiable, and so here's the investment only portion. And the defense counsel objected to that again. Then, and he requested a hearing, a restitution hearing. So the government then had a forensic accountant who reviewed three basic sets of information. He reviewed the bank records, the U.S. bank records, Del Carpio's bank records, Bank of America, Wells Fargo, to J.P. Morgan Chase. He also reviewed, and he reviewed that for both investments and returns. And he applied that only if there were third-party documentation, which he said bank records, bank documentation only. Then he reviewed the thumb drive, and based on the bank records alone, he found around 500,000 in returns. Then he reviewed the thumb drive provided by Del Carpio, and credited about 500,000 in returns there. There was another 254 that weren't credited. And then he looked at investor victims' information, and credited some things from there. Now, defense counsel asked him at one point, why aren't you crediting the returns off the thumb drive for Luz Martinez? And they're actually automatically generated, appear to be automatically generated emails from Banco Manex, which is a bank that Mr. Del Carpio has in Mexico. Automatically generated, notifying him of wire transfers that were made to Luz Martinez on a particular day, in a particular amount, to her Wells Fargo account. And so he asked the forensic expert, the forensic accountant, why did you not credit these emails on Luz Martinez? The documents that you've done show that she did in fact have a Wells Fargo account. And he said, is it because they're Mexican documents? What's the rationale? And the response of the accountant was just, well, let me look at my spreadsheets, and I don't show any documents in my spreadsheets. But there are in fact documents there. So defense counsel was objecting to the forensic accountant not crediting the information on the thumb drive. He was objecting to the forensic accountant not crediting victim testimony. He was objecting to the methodology used, that failed to credit for the returns. So all I did on appeal was actually point to evidence in the record that supports the objections he made, that there really are bank records. And that's what the forensic accountant was doing. He was reviewing those records. There are actually records to back up those claims. Now, it's possible I'm on plain air on some of the... I mean, I think he argued the methodology enough. But were I to be on plain air on some of the... returns that were not on the thumb drive, or that were not testified to, since the court, if it finds error on the other returns, would remand for that, I would argue that the court should be instructed to recalculate the restitution, taking into account that other information as well. Any other questions? Any other questions? And thank you for following. Thank you. Mr. Gupta. Good morning. May it please the court, Neeraj Gupta for the United States. I'll start with the sentencing guidelines. Probably a good decision. What's that? That's a good decision. The government would like to explain what happened there. There isn't an error in the money laundering guidelines. The PSR had an error in that it omitted the wire fraud guidelines calculation. It only included the money laundering guidelines calculation. But the money laundering guidelines calculations were correct. That's page 1609 of the record. And that lays out the PSR page. And that was calculated in the correct way under the money laundering sentencing guidelines. First, the wire fraud guidelines, the economic amount was calculated, and then the sophistication enhancement and the substantial impact on victims. And then that was used as the base level. And then separately and explicitly, these role enhancements were applied to the money laundering conduct. And that's what the hearing was about. But don't we have a problem with the way that the district judge is explaining how the abuse of trust and the leadership enhancements apply? Because the way I'm reading what the district judge is saying is the abuse, the position of public or private trust that is being abused is not moving money from one account to a different account. It is that you're holding yourself out as a broker and, you know, this fancy investor and getting your friends to give you money. I mean, it's all the stuff that makes it a Ponzi scheme. It's the wire fraud part. It's not the moving the money around to hide it slash spend it. So two responses to that question. The first one is that this case is different than the past case that was referenced in Appellant's brief where there were multiple guidelines being discussed at the sentencing hearing. Here, it was only the money laundering guidelines that were being discussed at the sentencing hearing. So the judge wasn't constantly saying, and this is why you're money laundering criminal activity. Here's relevant conduct for your money laundering. It wasn't made explicit, but it was all about money laundering. But what would be the abuse of trust that would go to money laundering? So secondly, the issue with the money laundering is that you couldn't spend the money if the victims weren't reassured and felt safe that you were holding their money for a long period of time. There were victims that testified that the reason that they let him hold their money for a year is because they trusted him because this business had had indicia of reliability. This Orozco and Murillo and Binder were involved and that that made them believe that this was a legitimate business, that these seemed like successful businessmen. So for the position of trust enhancement, they believed that he was a broker, which is one of the examples given in the guidelines for a position of trust, and they trusted him to hold their money. For example, a witness testified at the sentencing hearing, page 1273 and 1283, 1273 and 1283, that the reason he let DelCarpio hold his money for so long was because he trusted him and he testified at the same time that he was a broker. These were related concepts. So DelCarpio's position of trust as a broker enabled him to hold this money for so long and which allowed him to spend it. Yeah, but the very next paragraph says, I mean, I'm sympathetic to this argument, but I'm looking at what the witness says. The very next thing is, I started with a little and then I started giving it more because I trusted him. He seemed like he was giving me good interest rates, he looked fancy, he's got the thing with the screens and the clocks and all this stuff. So, again, even that testimony, I guess two points. One is that that testimony seems to, unless I'm misunderstanding it, seems to go to the wire fraud, but more important in what I'm wondering for the position of the government is when it comes to the findings, you know, the district judge obviously has to make the court's findings, and there's a passage in the transcript where the judge is finding as a matter of fact and preponderance evidence under the 3B enhancements. This discussion doesn't say that. This discussion says wire fraud. It doesn't say wire fraud. You know what I mean? It's talking about the stuff this defendant was doing to get the money. A couple responses. This is a factual finding, whether these enhancements apply, subject to clear error review. The question is evidence of these enhancements in the record. So we're pointing to the evidence, and as to that evidence, I think I'm rustling, as to that evidence, there isn't a clear cleavage in the relevant conduct between wire fraud and money laundering. Some of the conduct that was done by this group of people applied to both, and there's no case that says that they have to be surgically separated and can't overlap. So while there was some conduct that was purely money laundering, and there was some conduct that might have been purely wire fraud, there was also conduct that overlapped. For example, the lulling behavior by Binder could be both. It certainly helped the money laundering, it made the money laundering possible. The victims trusted that Del Carpio was holding their money, that this was legitimate business, and that allowed them to get further investments on some occasions. Did the government notice the mistake in the PSR? I don't think anybody did. It was a really several robust rounds of objections, and nobody seemed to have pointed this out. I think it was a mistake by the probation office, but in not including the wire fraud guidelines, but the result of using the money laundering guidelines was there's no error in the calculation of the money laundering guidelines themselves. Am I understanding it correctly? We're switching back and forth between two guidelines errors, right? As to the fact that the PSR includes one range and not the other. We wouldn't call that a guidelines error, but I take your point. But as to that one, if I'm understanding the position of the government, whether the omitted guidelines was lower, obviously the one that was provided would apply, because the higher the two applies. And if the one that was omitted was higher, then the higher one would apply, which of course wouldn't prejudice the defendant. I don't think that's the government's position. The government made a logical point in its brief, in our brief, that Del Carpio could only be advantaged if the question is which of these is higher, and only one of them is offered. There's a 50-50 chance that he'll be advantaged, and a 50-50 chance that there'll be no impact. I think we're saying the same thing. I'd just like to point out as well that in the record you were talking about, on page 1337, the judge separately found both prongs of the leadership enhancement. This is page 1337, that there were five or more, and that he was a leader of a criminal activity involving five or more people, and alternatively, in both, he was also a leader of a criminal activity involving three or more people, and the unknowing assistance of many outsiders who were not criminal participants. The judge separately found both of those, and made an effort to make that in the record. I'll move to restitution, unless there are any more questions on sentencing. As to the restitution, I think the Rickard case is useful as a comparison. That's the case very similar to Mahmood, which was already in one of the appellant's briefs. A criminal defendant in a healthcare fraud scheme argued at the restitution hearing that his or her loss amount should not be identical to their restitution amount, that although they got the business through fraud or through kickbacks, they still did provide some legitimate medical services, and therefore their restitution amount should be reduced. That was argued at restitution, and then the appeals court reviewed that, found the district court to be wrong, and that was reviewed de novo. This is not that case. This wasn't a case where the district court simply refused to reduce the loss amount by any repayments at all. The district court did do that, and it reduced the $6.5 million loss amount by $1.1 million of offsets and ordered $5.4 million in restitution. What's been raised on appeal for the first time is on page 61, 62, and 63 of appellant's brief are these U.S. bank records, these 26 transactions that were never raised before the restitution hearing, were never raised during the restitution hearing, and were never raised after the restitution hearing when appellant filed a bunch of Monex bank records. These are U.S. bank transactions that are being raised for the first time. These transactions were never before the district court. What's significant about this is that it was the defendant's burden under the Scheinbaum case and under the Lowe case, L-O-E, that's quoted in appellant's brief. It was appellant's duty to prove these offsets. This was never presented to the district court, so the district court didn't make an error. It's simply now on appeal, these transactions are being presented to this court, and this court is being asked to make a determination about whether the forensic accountant, the government's restitution expert, was wrong. The restitution hearing describes the restitution expert's process. He omitted transactions outside of the 2010 to 2012 time range of the scheme. He omitted transactions where he couldn't match an investment in U.S. bank records to a repayment because that was the only unless the investor actually put in money that he was counting the loss amount, he wasn't going to reduce that loss amount as an offset for restitution. As an example, on page 62 of appellant's brief, there's a victim called Harado, J-U-R-A-D-O. It's a $6,200 payment in November of 2011. Appellant says wasn't credited in restitution exhibit C3, government's exhibit C3. I know I'm getting into the weeds here, and that's the point. If you look at C4 of the restitution expert's exhibit, that payment appears to be there. There's a November 2011 payment of $6,200. It's just in a different list on C4. Now, that's why it's defendant's burden to raise the appellant's burden to raise these things at the restitution hearing so we can have a conversation and the district court can address these issues. And then the other issue on restitution is there's $20,000 to Luz Martinez. It's cited in the testimony. The forensic accountant for the government testified that she didn't get any repayments, that it was all reinvested. That's page 1402. And then Luz Martinez and her son both testified that they didn't get any money back. That's 635 and 667. So we don't think there's any plain error there either. A couple other things I'll just highlight just to clear up the briefs. On Issue 1, Count 13, the bank statement, I just want to make this clear, the bank statement that was put into evidence, that's Exhibit 2, pages 74 through 76, these are the Bank of America records, it clearly says that the money, the originating bank is Intercam Bank in Mexico. That was the bank record that was put before the jury and that the receiving bank was Bank of America in New York. And that was the evidence for the interstate commerce, the interstate transfer of the wiring. And then I'd just like to clarify one more thing from the briefing for Issue 4. That's the money laundering. I'd like to provide a records site. It's page 1068. 1068. And it's the testimony of the Secret Service agent. And in the reply brief, I think there's some confusion. The reply brief says that he testified that the bulk of the money in this Bank of America account was from the wire fraud scheme. That was not his testimony. The question is, is the bulk of the money in this Bank of America account from the wire fraud scheme? Page 1068. And his answer sharpens and strengthens that question. He testifies that all of the money from the Bank of America account and the Wells Fargo account were from investors slash victims. That's his testimony, page 1068. On 1047, he explains that he went through these bank records line by line. And that's the credibility finding. That's the credibility determination that the jury made. Now, in the reply brief on that issue, appellant asks the court to make an inference that he wasn't talking about all of the money in the bank accounts, but just all of the transactions that were testified to a trial. That's not a reasonable inference, and that's not this court's task on a sufficiency review. And then finally, on that, there was also some argument that there were unexplained deposits into those bank accounts and unexplained transfers from bank records, from Mexican banks, but that was explained at trial. For example, page 631 of the record, a victim named Luz Martinez testified that she had traveled across the border and deposited cash at a Del Carpio's Wells Fargo account. And on page 746, a witness named, a victim named Balderas testified that he had used the Bank Monax account as part of the scheme and then was shown records showing that Bank Monax had transferred that money to Wells Fargo at the same time. Any questions about anything? Thank you, counsel. We ask that the court affirm the judgment, sentence, and restitution order. Thank you. This may well rebuttal. On the sentencing guidelines issue, it's a legal error, and there were two separate legal errors. The first one had to do with the grouping rules, the commentary to 2S1.1, and incorrectly applying 3D1.2D, which is when everything is based on loss, and when the guideline specifically says apply 3D1.2C, which is when one guideline takes into account another guideline. Had they been separately calculated, the highest offense level would have been the 37 in the wire fraud. The government argues first that it's not error because the district court based the Chapter 3 enhancements on the money laundering. That's just not correct, and it's clear from the record. The government then also argues that it doesn't affect substantial rights because the facts are sufficient for those for the money laundering. It cites to a number of things. I'm going to address the four-level enhancement, leader organizer of criminal activity that involves five or more participants or is otherwise extensive. The court found five participants for the wire fraud and that it was otherwise extensive. In fact, the court's finding that it was otherwise extensive was the reason I didn't challenge that enhancement as to the wire fraud. For the participants, they have to be criminally liable. A wire fraud is a scheme. It's a fairly complex federal offense. Engaging in monetary transactions are discrete individual acts. In this case, we're talking about ten transactions by Del Carpio, three writing checks, and seven ordering wire transfers. The government at one point in their brief argues that one of the participants in these monetary transactions were Orozco and also Murillo, I guess, would fit in there because they were signatories on the accounts. That is incorrect. The only signatory on the Bank of America and the Wells Fargo accounts was Del Carpio. Those were personal accounts. The two JPMorgan Chase accounts, Orozco and Murillo, were signatories, but they were not involved in the monetary transactions. The government also argues Orozco and Murillo because they were recruiting people and getting paid in dirty money. Most of this recruitment, though, is in Mexico. If they're getting paid in Mexico, even if it's coming from Banco Monax, that's not engaging in monetary transactions. It's required by statute that the transaction be in the United States or that it be by a U.S. citizen. There's no evidence that Orozco or Murillo were U.S. citizens. The government also cites Binder, David Binder, who came in at the very end on sentencing and says he made lulling calls. He did make calls  Ortiz, and Mr. Ortiz testified that he began conversing with Binder in the early part of 2013. The wire fraud is alleged to have occurred from August 2018 to January 2012. The monetary transactions are alleged to have occurred in an eight-month period of time in 2011. So a call made by Binder in 2013 is outside the scope of this prosecution. This court has held that when it's a straightforward misapplication of an unambiguous guideline, that that is sufficient evidence for plain error. In fact, that was recently stated in a TORA's opinion from 2017 by Judge Smith, who is not a fan of plain error review. That guideline error got reversed and remanded. On the restitution, the burden issue is kind of unique here because the restitution statute said the burden is on the government, but a court can, under specific circumstances, put the burden, shift the burden to the defendant. What we have in this case is we have the government accepting the burden in the first instance. That's their forensic accountant going through the bank records, doing investments and returns. Then we have the defendant providing some records. And then at the very end, after all these calculations are done, the government argues that any other burden to produce returns should be on the defendant, and the defense argues, no, because you have better access to these people. So it's not clear that all of this was on the defendant, that the court placed all of it on the defendant, and even if it's under plain error review, this court has held that even $1 more in restitution affects substantial rights. Thank you for your argument, counsel. Both sides did very well.